**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**FRANKFORT**

**CRIMINAL CASE NO. 3:23-CR-16-GFVT-EBA**

**UNITED STATES OF AMERICA** **PLAINTIFF**

**V.** **<u>UNITED STATES'S SENTENCING MEMORANDUM</u>**

**JEREMY WAYNE HARRELL** **DEFENDANT**

* * * * *

The United States respectfully submits the following sentencing memorandum as to Defendant Jeremy Wayne Harrell. Harrell levels numerous, and often terse and overlapping, objections to the PSR. The government will first attempt to logically organize Harrell's objections into four categories and explain why each is factually and/or legally non-meritorious and, second, seek a specific sentence after analyzing the 18 U.S.C. § 3553(a) factors.

*Harrell's PSR Objections*

*First*, Harrell lodges several timing-based objections. He asserts, at various points, that the government "potentially" could not prove loss before September 14, 2022 (the date of Dr. Marsano's C&P Evaluation), and that the government could not prove loss "in 2019." Harrell's ambivalence is warranted. Overwhelming evidence at trial proved that Harrell was capable of substantial gainful employment throughout the time period of the Indictment, and specifically through September 14, 2022.

Start with the plenteous exhibits introduced against Harrell. Veterans Club's tax records—signed by Harrell under penalty of perjury—indicate Harrell working 60 hours per week in 2019, 2020, 2021, and 2022. [*See* Trial Exhibits 3A, 3B, 3C, and 3D.] His LinkedIn profile also supported loss in the relevant time periods. [*See* Trial Exhibit 5.] His emails also support loss prior to September 14, 2022. [*See* Trial Exhibits 10A, 10B, 11A, 12A, 13A, 14A, 15A, and 18A.] So do his social media posts, which document his many Veterans-Club-related activities throughout 2018 to 2022. [*See* Trial Exhibits 8A, 8B, and 8C.] (Due to its file size, Exhibit 8B cannot be filed on CM/ECF and will instead be conventionally filed.) For 2019 alone, the government submitted approximately 56 Instagram posts into evidence. These posts are Harrell's own words promoting the work he was conducting on behalf of Veterans Club and indicate Harrell's gainful employment capability.

Move next to his media appearances. His news and podcast appearances support loss during the at-issue time periods. [*See* Trial Exhibits 20A, 20B, 20C, and 20D, which will be filed as conventional filings.] News and magazine articles by and about him do too. [*See* Trial Exhibits 6A, 6B, and 6C.] As one article, published on August 22, 2019, described, Harrell had led Veterans Club stretching back to 2017 and, for his Veterans Club work, was named the Male Kentucky Veteran of the Year in 2018. [*See* Trial Exhibit 6C.] Harrell's news presence included stories about the multi-million-dollar project for the Tiny Home Community in Louisville and receiving the national Patriot Award, which is given to a nonprofit organization or individual that demonstrates positive, measurable impact in veteran-service-related areas.

Consider also the host of witnesses. At a minimum, David Willis, Julie Willis, Kassi Cawood, John Sisco, and Brandon Elder supported the overwhelming evidence that Harrell was capable of substantial gainful employment in the 2019 period. (The trial has not been transcribed, so the government cannot provide page citations to testimony.) Further, at a minimum, Tammy Yarbrough, Kristin Gallagher, John Miles, Lori Paris, Travis Rahill, Ronnie Knuckles, and Christine Miller did as well for the period before September 14, 2022.

Harrell unseriously claims that "[a]ll" the government "could show is that he filled out a form to be CEO," a "simple menial task that takes approximately 10-20 minutes to complete online." Harrell must not have observed the same trial as the Court. Suffice it to say that nearly every piece of evidence and witness offered at the trial contradicts Harrell's unfortunate effort to erase his work at Veterans Club.

In another salvo, Harrell also seems to argue that loss after October 19, 2023 (the date of Indictment), should not count. He is mistaken again. As explained at trial, Harrell continued to receive IU benefits after the Indictment due to his administrative appeal of the decision to end his benefits. He would not have received IU benefits after the Indictment but for his fraudulent maintenance of the benefits from 2019-2023. In other words, if he had been truthful with the VA and not committed this crime, he would not have received IU benefits after the Indictment. Accordingly, the amount of IU benefits after the Indictment is properly considered "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1(b)(1) *Notes to Table (C)(i). The term "offense" incorporates relevant conduct. U.S.S.G. § 1B1.1 cmt. n.1(I).

Relevant conduct, in turn, means all acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Harrell's post-Indictment receipt and acceptance of IU benefits, after affirmatively appealing the administrative decision to end his benefits to ensure he stayed on the government dole as long as possible, was part of the same course of conduct or common scheme or plan as the offense of conviction. As the Fourth Circuit explained in an analogous scenario:

> Tribble maintains that . . . the district court erred in computing the amount of loss his offenses had caused, because its calculation of loss included benefits he received after he was indicted. He asserts that the correct measure of loss is the reasonably foreseeable pecuniary harm resulting from his offenses, and that it was not reasonably foreseeable that the Government would continue to pay benefits to him after he was indicted. Tribble thus contends that the court's loss computation should properly have included only those benefits paid prior to his indictment.
>
> Tribble's contention on this point must also be rejected, because the sentencing court correctly applied the Guidelines in its handling of this issue. Under the Guidelines, the "actual loss" caused by an offense is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, comment. (n.3(A)(I)) (2004). In this situation, it was entirely reasonable for Tribble to foresee that he would continue to receive benefits until he was actually convicted. Like any accused, a defendant charged with workers' compensation fraud is innocent until proven guilty. Consistent therewith, the pertinent statute requires that compensation benefits be terminated when a beneficiary is convicted of a fraud scheme relating thereto. Tribble has failed to explain why the OWCP was required to deviate from that procedure here. Indeed, he does not contend that the OWCP (or any other government agency) gave him any basis for such an expectation. As a result, this final contention is also without merit.

*United States v. Tribble*, 209 F. App'x 332, 341-42 (4th Cir. 2006) (citation removed); *see also, e.g.*, *United States v. Jones*, 716 F.3d 851, 860-61 (4th Cir. 2013) ("[I]t is entirely foreseeable that losses caused by a fraudulent scheme will not cease the moment

that coconspirators confess to the fraud. . . . We therefore conclude that it was reasonably foreseeable that the Navy would not terminate BAH payments until it had finished its investigation and formally determined that the BAH funds had been illicitly obtained. While one can quibble over whether the Navy acted with utmost dispatch to stop the payments to Alexander and Bowers, we nonetheless believe that the amount estimated by the district court was a foreseeable loss caused by the fraud."); *United States v. Fecondo*, No. 22-00011, 2023 WL 7646494, at *8 (E.D. Pa. Nov. 14, 2023) (citing cases) ("Although the Government charged Defendant's failure to pay over employee payroll taxes only during 2015 and 2016, it proved, by a preponderance of the evidence, that Defendant engaged in virtually identical conduct both prior to the investigative period and continuing after the Indictment. Accordingly, I find that the 2017–2019 conduct properly counts as relevant conduct for purposes of determining the tax loss."); *cf. United States v. Rivera-Ortiz*, 14 F.4th 91, 104 (1st Cir. 2021) (approving including loss figures from "outside of the timeframe set forth in the indictment" based on definition of relevant conduct); U.S.S.G. § 2B1.1 cmt. n.3(E)(ii) (stating that in "a case involving government benefits," as here, "loss shall be considered to be not less than the value of the benefits obtained by unintended recipients," i.e., the full value of the IU benefits obtained by Harrell, an unintended recipient).

*Second*, Harrell attempts to relitigate the trial issue of whether he received the February 6, 2019, letter. [*See* Exhibit 4G.] The trial evidence and testimony overwhelmingly proved that he did. Tyler Rothstein explained that, if the letter had been returned as undeliverable to the VA, there would have been a record of such, but that no

such record existed. Thus, the absence of proof of the letter's undeliverability shows that the letter was in fact delivered. Further, the letter was addressed to the same Shelbyville address as all of Harrell's other VA correspondence during the relevant period and as was listed on the bank account where he received his VA benefits, and he does not claim that he did not receive any of the other correspondence. [*See* Trial Exhibit 4A.] Harrell, confusingly, also argues that there was no proof of when the letter was mailed. But the letter was dated February 6, 2019, which reasonably indicates its mailing.

Separately, whether Harrell received the February 6, 2019, letter is, in truth, not critical. He had been on notice *since 2011* that, as a recipient of benefits based on an inability to work, he had an obligation to inform the VA upon his return to work. [*See* Trial Exhibit 4C.] The idea that a recipient of benefits for being unable to work would not know he needed to report becoming the CEO of an organization blinks reality. Harrell's numerous falsehoods that were exposed at trial—to the VA, to the SSA, to his own expert, to Veterans Club's own CPA, in written statements, in oral statements—show that he was well aware that his activities as CEO of Veterans Club would render him ineligible for IU benefits and that he needed to not disclose and affirmatively conceal his activities and role at Veterans Club to continue on the government dole. [*See, e.g.*, Trial Exhibits 4I, 4J, 4K, and 4L.] Additionally, as shown at trial, Veterans Club was legally formed on or about February 5, 2019. [*See* Trial Exhibit 2.] That the proof arguably supported an offense start date of a day earlier, and thus, perforce, supported the conservative start date chosen by the grand jury via this alternative avenue, further shows the letter's lack of cruciality.

*Third*, Harrell objects to the inclusion of loss based on VA Dependents' Educational Assistance (DEA) benefits that his wife and daughter received as a result of his fraudulent receipt of IU benefits. In this context, DEA benefits are tied to IU benefits; Harrell's wife and daughter, in other words, would not have been entitled to and would not have received DEA benefits but for Harrell receiving IU benefits, which he did fraudulently during the relevant period. Accordingly, because the VA wrongly expended money in DEA benefits as a result of Harrell fraudulently qualifying for IU benefits during the relevant period, the amount of DEA benefits included in the PSR is correctly considered loss because it is "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1(b)(1) *Notes to Table (C)(i).

Against this straightforward analysis, Harrell first asserts that there was "[n]o proof" of fraudulent educational benefits offered. That is wrong. Tyler Rothstein testified to the fact that Harrell's wife and daughter got DEA benefits as a result of Harrell qualifying for IU benefits. Rothstein testified that Harrell's wife and daughter would not have been eligible for DEA benefits but for Harrell receiving IU benefits. Further, exhibits admitted at trial proved the tie between IU benefits and DEA benefits. [*See* Trial Exhibits 4F and 4M.] The government may offer additional testimony and/or exhibits at sentencing to support the inclusion of DEA benefits in the loss amount. [*See* Sentencing Exhibits 1 (8/26/24 VA Rating Decision), 2 (VA Letter to Wife), and 3 (VA Letter to Daughter).] *See also* 38 C.F.R. § 21.3021(a)(1)(iii) & (a)(3)(i). Harrell also baldly asserts, without citation or explanation, that his "family is entitled to educational benefits." He, notably, does not assert that his family is entitled to *DEA* benefits.

Without a citation or specific explanation of which educational benefits his family is purportedly entitled to, the United States cannot rebut or even substantively address such a nebulous claim.

*Fourth*, Harrell appears to assert, although the exact basis for the objection is not clear, that the $128,615.25 figure for IU loss is "incorrect." He gives no reason for this unexplained, conclusory assertion. The figure is correct, as proven at trial. [*See* Trial Exhibit 17B.]

Accordingly, the Court should overrule Harrell's objections to the PSR.

*Sentencing Analysis*

Applying the factors set forth in 18 U.S.C. § 3553(a), the Court is tasked with imposing "a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" § 3553(a)(2). In doing so, the Court "shall consider" the seven § 3553(a) factors. As to Harrell, the factors support a sentence of 18 months of imprisonment, followed by 3 years of supervised release.

*The nature and circumstances of the offense.* The nature and circumstances of the offense are aggravating and patently justify an 18-month sentence. Harrell stands convicted, after a jury trial, of theft of government funds from February 2019 through October 2023. The PSR documents the facts. PSR ¶¶ 7-23. The Court will also recall the facts, having conducted a jury trial. Essentially, as proven, Harrell failed to disclose to and affirmatively concealed his ability to work from the VA—particularly, his activities as the active, passionate, and successful CEO of Veterans Club—to the end that he continued to fraudulently receive IU benefits for a period of approximately four and a

half years, and, indeed, even after the Indictment. Harrell stole over $128,000 of taxpayer money, intended to benefit veterans who were actually unable to work. The VA lost even more as a result of Harrell's criminality, to the total tune of over $207,000 illegitimately expended based on Harrell fraudulently receiving IU benefits.

The trial detailed many of the ways that Harrell's crime personally benefitted him and his family. He personally pocketed over $128,000 from taxpayers that he should not have received. His wife and daughter received free college or post-graduate educations. And it wasn't true that he didn't receive a dime from Veterans Club; to the contrary, he used a Veterans Club credit card for things like gas in his personal truck and meals—expenses that, over roughly 4.5 years, would amount to quite a benefit.

The trial further detailed the deceit Harrell engaged in and the lies Harrell told. He never disclosed to anyone at the VA who made decisions about benefits that he was the CEO and Founder of Veterans Club. When given the opportunity during the C&P Evaluation with Dr. Marsano, Harrell made affirmatively false statements about his ability to work and what he does for Veterans Club. Harrell and his wife affirmatively lied to the SSA—documents available to and considered by the VA. Harrell also lied to his own expert witness and Veterans Club's own CPA, claiming that he only worked 30 hours per week. [*See* Trial Exhibit 3E.] Harrell also deceptively put on a false show of dependence at the time of his C&P Evaluation—most acutely shown by the fact that he and his wife drove to the VA together from a parking lot just a few miles away and immediately returned there and went their separate ways after the evaluation, with Harrell engaging in guilt-indicating evasive maneuvering—running the red light, doubling back,

looking at Agent Schilling in his car—once he realized he was being observed.

Witnesses gave additional color to Harrell's lies and obfuscation. Witnesses described how Harrell deliberately avoided being paid by Mighty Oaks and from money received from Southeast Christian Church to avoid having his VA benefits "messed with." Witnesses also described Harrell's statements about needing an assistant, how full his schedule was, and how busy he was. Harrell directly told David Willis, "I could work a normal day job; I just don't want to." Harrell's behavior, in sum, consistently indicates that his intent was to defraud the VA; indeed, he openly bragged about it.

*The history and characteristics of the Defendant*. Like many individuals, Harrell has a mix of positive and negative characteristics. Harrell's surface positives include his high-school education and military service. PSR ¶¶ 58, 60. There does not appear to be anything "unusual" about Harrell's military service that "distinguishes the case from the typical cases covered by the guidelines," except, if anything, the degree to which Harrell betrayed the values of honesty, integrity, and forthrightness that the military instills and stands for. U.S.S.G. § 5H1.11. He also has done generally good work as the Founder and CEO of Veterans Club—a career that ultimately, of course, led to his conviction of a federal felony. U.S.S.G. § 5H1.5 ("Employment record is not ordinarily relevant."); *id.* § 5H1.11 ("Civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted."). Education and vocational skills are, too, "not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. § 5H1.2. Harrell, further, has a limited criminal history, which is accounted for in the guideline range through being in

criminal history category I and receiving the Zero-Point Offender reduction. PSR ¶¶ 34, 40-43. As the Sixth Circuit has eloquently expressed:

> These factors are disfavored for good reason. To prioritize a defendant's education, professional success, and standing in the community would give an additional leg up to defendants who are already in a privileged position. Indigent defendants are less likely to impress a sentencing court with their education, employment record, or local reputation. But they are no less deserving of a reasonable and compassionate sentence. That is why Congress and the Guidelines oppose a class-based system where accumulated wealth, education, and status serve as credits against a criminal sentence.

*United States v. Boucher*, 937 F.3d 702, 711 (6th Cir. 2019). Accordingly, the "simple markers of privilege" that Harrell is likely to highlight should be viewed "with suspicion" by the Court. *Id.* at 712.

And quite to the contrary, Harrell's negative characteristics dominate. One of the most striking of Harrell's characteristics is his unabashed willingness to deceive and lie, as detailed in this memorandum. Another of the most prominent is Harrell's unashamed desire to steal from his fellow veterans. That element of Harrell's character is one of the most aggravating parts of this case: Harrell put himself out in the world as a champion of veterans, yet, in reality, he was deceiving the VA and stealing from his fellow veterans. He harmed, month after month, as he took check after check of ill-gotten funds, the very veterans he purported to help. This case, thus, calls out for a punishment more severe than that imposed on a veteran who simply returned to work at a for-profit company and lied about it. In contrast, Harrell affirmatively branded himself as a veterans' champion, all while stealing money that should have rightfully gone to veterans who were actually unable to work. The Court's sentence should reflect this aggravating fact.

The surface positives that Harrell will likely tout (in contrast to his efforts to minimize or erase his contributions to Veterans Club in his PSR objections), considered in light of his behavior and the personal characteristics the behavior exposes, are, thus, in truth, insidious—depicting a two-faced individual who shows the world a successful, honorable façade, but who, inside, and in his private dealings with the government, is marred by lying, deceit, and fraud. As argued to the jury, this case exposed the two Jeremy Harrells: the one he curates to display to the public, to his loyalists, and on social media, contrasted with the one he reveals in private, when asking for government checks. This sentencing concerns the proper punishment for the latter, and Harrell's predominating negatives thus show his surface positives in a different light; Harrell, for instance, made a mockery of the Army's values and the principles of servant leadership that he purports to implement in his life. If anything, a defendant deceptively using the advantages he has in life—education, military experience, work experience—to personally profit through deceiving the government and stealing from the very population he purports to assist inflicts greater harm, and warrants greater punishment, than a defendant who has not had the so-called advantages in Harrell's life.

*The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence.*

A sentence of imprisonment of 18 months will adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment. The seriousness of the offense is covered extensively above. Eighteen months adequately accounts for the numerous aggravators discussed. Such a sentence likewise will promote respect for the

law and provide just punishment. Additionally, adequate deterrence is a vital consideration in this sentencing—both to deter Harrell, but also others in society who may be contemplating similar behavior.

As to Harrell, deterrence is of utmost importance. Harrell has never acknowledged any wrongdoing in this case, indicating a strong need to deter him from continuing this or similar behavior in the future, since he sees nothing wrong with it. His behavior toward the end of the relevant time period demonstrates this. Having realized that IRS filings may be used against him, he sought to fraudulently manipulate the number of hours listed under his name via his email to Veterans Club's CPA. And there is no indication that Harrell would have ceased his illegal conduct, had it not been for this case—indeed, even *after* the Indictment, he continued to collect IU benefits that he knew he was not entitled to. Further, in a social media post, Harrell falsely claimed to have not received "any materialistic gain such as money," in contrast to the evidence presented at trial. [*See* Sentencing Exhibit 4.] Asserting that he "know[s] [he's] done the right things," he labels this case "this erroneous case against me." [*Id.*] He seems to denigrate the jury of his peers that found him guilty beyond a reasonable doubt as a group of "imperfect people." [*Id.*] Without seeming to recognize the hypocrisy, he—whose livelihood was wrongly subsidized by taxpayers for years—criticizes "[m]ost people," who "benefit off the sweat equity and success of others." And he seems to malign the witnesses as people who "betray[ed]" him "because they are weak and have no backbone," warning that he "ha[s] a running list of names that continues to grow of those [he] will not look twice at going forward" and who "will soon realize that they can't be

successful." [*Id.*] Harrell's brazen refusal to accept responsibility, in light of his post-Indictment and post-conviction conduct, as well as the clear inconsistencies between his work on behalf of Veterans Club and his statements to the government, highlights his sore need to be held meaningfully accountable by the Court.

As to others in society (general deterrence), prosecutions like Harrell's are essential to a functioning society and a trustworthy government. Prosecutions like this demonstrate to others in society that fraudsters are brought to justice and that the public coffers are protected against those who attempt to steal from them. Harrell's punishment should reflect to others in society that lying to obtain government benefits will not be excused with a slap on the wrist. The Court's sentence should reflect this core deterrence consideration and the urgent need for a real consequence for Harrell.

*The need to avoid unwarranted sentencing disparities.* A guideline sentence will minimize the risk of creating an unwarranted sentencing disparity. *United States v. Houston*, 529 F.3d 743, 754 (6th Cir. 2008). The government "is aware of no factors, either mitigating or aggravating, which would justify a departure from the guideline range." PSR ¶ 79. On the other hand, in a case of this nature, a variance would risk producing an unwarranted sentencing disparity. The unique combination of circumstances this case presents calls for a guideline sentence, not a variance.

The Court should also include a guideline-range fine. "The fine range . . . is from $7,500 to $75,000." PSR ¶ 73. Harrell discloses $478,000 in assets and a net worth of $168,000. PSR ¶ 61. Given Harrell's overall financial picture, educational background, and ability to be employed, a fine is appropriate and necessary to convey the seriousness

of the offense, promote respect for the law, and provide adequate deterrence. *See United States v. Breeding*, 109 F.3d 308, 311 (6th Cir. 1997) ("[H]igher fines are more potent deterrents to crime.") (quoting *United States v. Turner*, 998 F.2d 534, 536 (7th Cir. 1993)). Considering all the relevant factors, the United States seeks a fine of $8,400, just above the bottom of the range under § 5E1.2(c)(3), and a mere 5% of Harrell's net worth. *See United States v. Lumbard*, 706 F.3d 716, 726-27 (6th Cir. 2013) (noting "the fine-specific factors set forth in 18 U.S.C. §§ 3571 and 3572" the Court must consider); PSR ¶ 62 ("Harrell has a limited ability to pay a fine.").

Restitution is mandatory in this case. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii) (imposing mandatory restitution for offenses "against property under this title . . . , including any offense committed by fraud or deceit"). "Pursuant to 18 U.S.C. § 3663A, restitution in the total amount of $207,249.26 shall be ordered in this case." PSR ¶ 75. Harrell seems to tie most of his restitution arguments to his loss arguments, although they are not identical inquiries. "Restitution is remedial in nature, and its goal is to restore the victim's loss." *United States v. Boring*, 557 F.3d 707, 714 (6th Cir. 2009). For the reasons explained in this memorandum, the PSR's $207,249.26 restitution figure accurately captures the VA's loss. Harrell seems to make the additional argument, specific to restitution, that the VA sent a letter indicating he owes $130,777.39. But that figure relates solely to the administrative calculation of the IU benefits he fraudulently received, not the DEA benefits. [*See also* Sentencing Exhibits 2 and 3.] The Court should, likewise, include a $108,454.88 forfeiture money judgment in the judgment based on the government's unopposed motion. [R. 55: Motion for a Preliminary Order of

Forfeiture.] *See* LCrR 47.1(d) ("Failure to timely respond to a motion may be grounds for granting the motion.").

Harrell discloses $52,000 in liquid assets (bank accounts and cash). PSR ¶ 61. Given these liquid resources, the Court should, using its discretion to set a payment schedule, order Harrell in the Judgment to apply them to his monetary obligations within 10 days of sentencing, to ensure that the harm done to the VA begins to be promptly undone. *See* 18 U.S.C. §§ 3572(d), 3664(f); *United States v. Hack*, 999 F.3d 980, 985 (6th Cir. 2021) ("The MVRA offers district courts discretion in determining the schedule's precise terms, setting forth numerous possible methods of payment, including a lump-sum payment, installments, periodic nominal amounts, or a combination of methods."). Harrell has resources that he can and should apply to the payment of his monetary obligations. These assets could be easily transferred or otherwise diminished, leaving Harrell enriched and his victim harmed. It is therefore vital that the Court require that Harrell use these resources to pay his monetary obligations on a relatively short time frame. Prior to the filing of this memorandum, the United States requested that Harrell voluntarily apply his cash and bank accounts to his restitution obligations, but Harrell did not respond. Accordingly, the United States must now request that the Court require him to do so in its Judgment.

Accordingly, after considering the § 3553(a) factors, the Court should impose a sentence of imprisonment of 18 months, followed by 3 years of supervised release, a fine of $8,400, restitution in the amount of $207,249.26, a money judgment in the amount of $108,454.88, and the required special assessment.

Respectfully Submitted,

CARLTON S. SHIER, IV
UNITED STATES ATTORNEY

By: s/ James T. Chapman
Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507-1612
(859) 685-4804
James.Chapman2@usdoj.gov

## CERTIFICATE OF SERVICE

On December 4, 2024, I electronically filed this document through the ECF system, which will send notice of electronic filing to all counsel of record.

s/ James T. Chapman
Assistant United States Attorney