**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**FRANKFORT**

UNITED STATES OF AMERICA, )
)
PLAINTIFF )
)
v. ) CASE NO. 3:23-CR-00016-GFVT-EBA
)
JEREMY WAYNE HARRELL, )
)
DEFENDANT )

* * * * * * *

**JEREMY WAYNE HARRELL SENTENCING MEMORANDUM**
*ELECTRONICALLY FILED*

Comes Jeremy Wayne Harrell, by counselors, Nick Mudd and Casey McCall, and respectfully submits to this Honorable Court a Sentencing Memorandum in support of law and argument, in anticipation of the Defendant's Sentencing Hearing set to be heard on the 9th day of December 2024, at 2:30 P.M., in the United States District Court Eastern District of Kentucky at Frankfort in front of the Honorable Gregory F. Van Tatenhove.

## I. PROCEDURAL AND FACTUAL BACKGROUND

On August 23, 2024, Mr. Harrell was found guilty by a jury of his peers on the single count of 18 U.S.C. § 641, Theft of Government Property Over $1.000. The indictment alleges that between February 6, 2019, and October 19, 2023, Mr. Harrell, in Shelby County, Eastern District of Kentucky, knowingly and intentionally embezzled, stole, purloined, and converted Individual Unemployability disability payments from the United States Department of Veterans Affairs, to which he was not entitled. Counselors submit the following memorandum of facts and law pursuant to the Court's November 25, 2024, Order in anticipation of argument regarding disposition of this case on December 9, 2024, at 2:30 P.M. in front of this Honorable Court.

## II. UNITED STATES SENTENCING GUIDELINES

The PSR has Jeremy's total offense level at 14. ***PSR 7 at 36***. The defendant objects and request this Court conclude Jeremy's total offense level be a minimum of eight (8) and a maximum of eleven (11).

### A. UNDISPUTED GUILDELINE CALCULATIONS—BASE LEVEL AND ZERO-POINT OFFENDER

The undersigned agree the base offense level is six (6) pursuant to USSG § 2B1.1(a)(2). ***PSR 6 at 28***. The defense further agree Jeremy is a Zero-Point Offender pursuant to USSG §§4C1.1(a)(1)-(10), and therefore entitled to a two (2) point deduction, putting his starting offense level at four (4). ***PSR 7 at 34***.

### B. DISPUTED GUIDELINE CALCULATIONS—LOSS AMOUNT

The dispute over the guideline calculation—and the central tenant of most of the undersigned's objections— relate to the loss amount pursuant to §2B1.1(b)(1)(F). The undersigned objects to the PSR's conclusion that the loss amount is $207,249.26. ***PSR 6 at 23***.

#### 1. THE DEA CHAPTER 35 BENEFITS SHOULD NOT APPLY TO THE TOTAL LOSS AMOUNT

This Honorable Court heard proof for a week from approximately twenty (20) Government witnesses. There was never more than a glimmer of testimony by any of the witnesses regarding loss amounts for DEA Chapter 35 benefits. The Government is now choosing to add an additional $78,634.01 loss that no proof was ever offered for at trial. ***PSR 6 at 20-23***.

The Government has never disputed that Jeremy was a fully disabled VET from December 23, 2010, to January 27, 2019. For over eight (8) years his dependents were entitled to

those educational benefits. For over eight (8) years when he was suicidal, depressed, and withdrawn, he was entitled to his dependents receiving those benefits—approximately 96 months of benefits for each dependent. It is unfair for the Government to now attribute DEA Chapter 35 benefits loss to Jeremy to fluff up the guideline calculations. Nowhere did they mention it in the indictment. Nowhere was it mentioned and argued to the jury. This is an 11th hour claim to bump him up another two (2) levels.

If the Court subtracts the education benefits from the PSR calculation, this leaves: $207,249.26 - $46,648.24 - $31,985.77 = $128,615.25. ***PSR 6 at 21-23***. Under USSG §2B1.1(b)(1)(E), this means only eight (8) points would be added, leaving Jeremy with a total offense level of twelve (12), putting Jeremy in Zone C. If the Court does add in the Government's 11th hour claims, this bumps Jeremy outside of Zone C entirely.

While later in this memorandum the undersigned will be requesting a variance, if the Court concludes that Zone C is the appropriate zone and denies any further requests for a variance, the undersigned respectfully requests this Court give Jeremy a split sentence of five (5) months home detention and five (5) months in custody, pursuant to United States Sentencing Commission, Guidelines Manual, §1A4(d) (Nov. 2024).

## 2. THE IU OVERPAYMENT SHOULD BE COMPUTED FROM THE SEPTEMBER 14, 2022, THE C&P EXAMINATION DATE

The undersigned requests this Honorable Court only attribute loss for purposes of the guideline calculations from September 14, 2022, to October 19, 2023. Counsel recalls the Government asserting that if Mr. Harrell had been truthful with Dr. Marsano during the September 14, 2022, C&P Exam, we may not even be here. This is important because had he been truthful, the VA most likely would have terminated his IU payments from that date, and this

case would have never been brought. September 14, 2022, would have been the date that a proper examination was conducted to make a proper determination for terminating the benefits.

Tyler Rothstein stated during his testimony that there is no hard definition anywhere in the Federal Regulations, whether with the VA or the Department of Labor, of what defines "work" and "substantial gainful employment." He could not point us to a definition. During his testimony, he stated the C&P examiner is to conduct the examination, then forward their results and recommendations to the VA Rater. The VA rater is the one who assigns the rating and ultimately determines the level of disability and whether a veteran is entitled to IU benefits. Not a prosecutor. Not a Court. Not a defense lawyer. The VA Rater then, in essence, define if someone is engaged in "work" and/or "capable of substantial gainful employment."

Tyler Rothstein as the VA rater had the final say in this case. His opinion was based on a C&P examination conducted by Dr. Marsano. If no C&P exam was conducted to base any opinion on by a VA rater whether Jeremy was capable of substantial gainful employment in 2017, 2018, 2019, 2020, or 2021, the Government does not get to be judge, jury, and executioner and arbitrarily decide that January 28, 2019, is the date Jeremy is "capable of substantial gainful employment." No C&P exam was ever conducted in these prior years, so according to Tyler Rothstein, no prior determination could be made. Filling out and filing a form online creating an LLC does not indicate any substantial gainful employment. Filing documents to create an LLC online with the Secretary of State's website takes at most twenty (20) minutes to perform, even with someone who is inexperienced. This does not prove at all, in any capacity, Jermey was capable of "substantial gainful employment," in January of 2019. And Tyler Rothstein's own testimony affirms this when he detailed at length the process that must be conducted to make such determination to decide if someone is entitled to IU benefits.

Rothstein testified that it is a lengthy process. In fact, the Government provided expert disclosure regarding Mr. Rothstein's expert opinions as a VA rater. A qualified C&P examiner in that field of whatever ailment(s) the veteran suffers must evaluate them. And then, and only then, does the VA rater review that information, and based on their training and experience, issue an opinion on whether or not the veteran is capable of "substantial gainful employment."

The C&P exam we have to rely on for Jeremy was conducted by Dr. Marsano on September 14, 2022. The Government did not and cannot offer any proof to show that prior to September 14, 2022, that Jeremy was engaged in substantial gainful employment as their own expert Tyler Rothstein has defined it. The process did not occur prior to this date. They have nothing to base this on per the process that is required to make the determination per the Government's own expert, Tyler Rothstein. This means that use of any date for computing the loss amount prior to September 14, 2022, by their own expert Tyler Rothstein's admission and professional opinion, is faulty and unreliable, and therefore the September 14, 2022, is our best starting point.

As the undersigned mentions in Objection 1, during trial it became apparent that the Government potentially could not prove the starting date in the indictment as a basis for showing Jeremy was capable of substantial gainful employment in January of 2019. At one point the prosecution mentioned to the Court in a bench conference that they didn't need to prove their case on the starting date mentioned in the indictment; and that they could prove the case from the start date of September 14, 2022. ***PSR 16***. While the Government was correct they could still prove a loss amount greater than $1,000 for purposes of guilt/innocence with the jury with the September 14, 2022, date, the defense asks the Courts to recall this discussion and factor this into

the calculation of loss for guideline purposes, and use September 14, 2022, as the starting date of loss.

If the Court uses September 14, 2022, as the starting date, and uses an end date set out in the indictment of October 19, 2023, under USSG §2B1.1(b)(1)(C), only four (4) points would be added for the specific offense characteristics, leaving Jeremy with a total offense level of eight (8). This would put him in Zone A, at which point the defense would strongly requests the Court probate Mr. Harrell, as allowed by the Federal Sentencing Guidelines.

If the Court uses September 14, 2022, as the starting date, and uses an end date of when the final IU payment was made to Jeremy on August 1, 2024, under USSG §2B1.1(b)(1)(D), only six (6) points would be added for the specific offense characteristics, leaving Jeremy with a total offense level of ten (10). This would put him in Zone B. If this is the Court's determination, the defense requests this Court probate the entire sentence which is allowed under the November 1, 2023, Sentencing Guideline amendments; or in the alternative sentence him to thirty (30) days imprisonment, and probate the remainder, as prescribed by the Federal Sentencing Guidelines.

### 3. THE IU OVERPAYMENT DATE CALCULATION SHOULD END ON THE DATE OF THE INDICTMENT, OCTOBER 19, 2023

During trial the Government only alleged loss through the date of the indictment, on or about October 19, 2023. The defense requests this be the date cap on the guideline calculations for loss calculation. No proof was offered at trial for loss after this date. The Department of Veterans Affairs was aware of this criminal action and chose to keep paying Jeremy the IU benefits after the date of the indictment. They are the same party as the United States, just under a different branch. The VA voluntarily chose to continue paying Jeremy the IU benefits, having full knowledge of this case, having all the C&P Examination information, and having Tyler

Rothstein's VA Rater opinion. Jeremy should not be punished and pushed into a higher guideline calculation solely because another branch of government voluntarily chose to continue paying him the benefits with knowledge of everything before the Court. Depending on the Court's ruling on other parts of this motion, adding the extra payments past the date potentially could add two (2) levels to his total offense level. The defense would request this extra loss claim by the Government not be allowed.

## III. THE STATUTORY SENTENCING FACTORS

### A. LAW: SETENCING UNDER *BOOKER*

Under ***Booker***, sentencing courts must treat the guidelines as just one of several sentencing factors set forth in ***18 U.S.C. §3553(a)***. After applying the guidelines in Chapters Two, Three, and Four of the Guidelines Manual, sentencing courts calculate a guideline range pursuant to Part A of Chapter Five. Sentencing courts then may consider any information concerning the background, character, and conduct of a defendant when deciding what sentence to impose.[1]

The primary directive in ***Section 3553(a)*** is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." ***Section 3553(a)(2)*** states that such purposes are:

(A) to reflect the seriousness of the offense, to promise respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

---

[1] https://www.ussc.gov/sites/default/files/pdf/training/primers/2023_Primer_Departure_Variance.pdf

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, ***§3553(a)*** further directs sentencing courts to consider the following factors:

1) "the nature and circumstances of the offense and the history and characteristics of the defendant" (***§3553(a)(1)***);

2) "the kinds of sentences available" (***§3553(a)(3)***);

3) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (***§3553(a)(6)***); and

4) "the need to provide restitution to any victims of the offense." (***§3553(a)(7)***).

Other statutory sections also give the district court discretion in sentencing. Under ***18 U.S.C. §3582***, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the Section ***3553(a)*** factors, the judge is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation."

Under ***18 U.S.C. §3661***, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." This statutory language certainly overrides the (now-advisory) policy statements in Part H of the sentencing guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. ***See U.S.S.G § 5H1; see also United States v. Nellum, 2005 WL 300073, 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. 2005) (Simon, K.) (taking into account fact that defendant, who was 57 at sentencing, would upon his release from***

***prison have a very low likelihood of recidivism since recidivism reduces with age); citing Report of the U.S. Sentencing Commission, Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines, May 2004)***.

In every case, then, a sentencing court must now consider all the ***§ 3553(a)*** factors, not just the guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing. And where the guidelines conflict with other sentencing factors set forth in ***§ 3553(a)***, these statutory sentencing factors should generally trump the guidelines. ***See United States v. Denardi, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J, concurring in part, dissenting in part) (arguing that since § 3553(a) requires sentence be no greater than necessary to meet four purposes of sentencing, imposition of sentence greater than necessary to meet those purposes violates statute and is reversible, even if within guideline range)***.

## B. APPLICATION OF THE STATUTORY SENTENCING FACTORS TO JEREMY HARRELL

Regardless of the Court's conclusions about the total offense level, the Court is not bound by the Sentencing Guidelines. In the present case, the following factors must be considered when determining what sentence is sufficient, but not greater than necessary, to satisfy the purpose. The undersigned pray this Court grants a variance allowing Jeremy to be probated to the community.

### 1. The Nature and Circumstances of the Offense

Up until the present indictment, Jeremy had never been in trouble for anything other than a speeding ticket. This is a case of a man who did the wrong thing for the right reasons. Jeremy never wanted to take a dime from Veteran's Club. He didn't do it to make money or become rich. He prided himself on working tirelessly to help veterans all over the state of

Kentucky. He was getting around $22,000 a year from the IU benefits. Testimony from Government witness and attorney Christine Miller was that the Veteran's Club board would have easily agreed to pay Jermey $100,000 to $150,000 salary a year. But he didn't ask. He didn't want to be paid to help the veterans. He didn't want to take it because he cared about making sure the money was there to help the veterans, not make a quick buck.

This wasn't a scheme or plan. This wasn't a mastermind who defrauded investors or stole money from Government contracts. He is not a career criminal. This is a story of a man who gave his time, his energy, and his life to helping veterans. If Jermey did this to make money, he would have given up the $22,000 a year IU benefit and taken the big $100,000+ paycheck—almost five (5) times what he would have gotten from the IU benefits.

2. **History and Characteristics of the Offender**

As the PSR demonstrates, the complete lack of any criminal history, strong family ties to the state of Kentucky, lack of violations while on pretrial supervision, military service, educational and vocational skills, and strong history of service to our community and our veterans, collectively demonstrate Jeremy would be an excellent candidate for a below-guideline sentence.

The Government did its best to call witnesses from the Veteran's Club who no longer had a great relationship with Jeremy. Despite this, every single witness who interacted with him said the same thing over and over: he cares about veterans and has done more to help veterans than anyone else in the state of Kentucky. That summarizes Mr. Harrell's life work up to this point. You know you have done good deeds when even your enemies concede you have done great work, helped lots of people, and have fought for the rights of those in need.

As the Court can see by Jeremy being a Zero-Point Offender, he has no prior criminal

history before the present case. After sentencing he will be a convicted felon for the rest of his life. No right to bear a firearm. No right to vote. A Scarlett letter that will follow him to the grave.

Research performed by the United States Sentencing Commission has shown that defendants like Jeremy who have no prior criminal convictions have an even lower rate of recidivism than those individuals in criminal history category I who do have prior criminal history. Defendants like Jeremy are "the most empirically identifiable group of federal offenders who are least likely to offend." ***United States Sentencing Commission, Recidivism and the "First Offender", May 2004***. First offenders recidivate less frequently in a way that's not taken into account by the sentencing guidelines. ***See "A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score", at 14-15, available at http://www.ussc.gov/publicat/RecivismSalientFactorCom.pdf; see also U.S. v. Cabrera, 567 F. Supp. 2d 271 (D. Mass. 2008) (significantly reducing a sentence based on the fact that defendants with zero criminal history points are less likely to recidivate than other defendants in criminal history category I).***

This lack of prior criminal history also means that a sentence of incarceration carries a more significant impact upon Jeremy than it would upon an individual with a prior history in the criminal justice system. This was the rationale behind the court's holding in ***U.S. v. Baker*** in upholding a sentencing reduction based on the finding that "a prison term would mean more to Mr. Baker than to a defendant who previously had been imprisoned.***" U.S. v. Baker, 445 F.3d 987, 992 (7th Cir. 2006)***. "Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to reoffend." ***U.S. v. Qualls, 373 F. Supp. 2d***

***873, 877 (E.D. Wis. 2005)***.

The mere fact that Jeremy is becoming a convicted felon is in itself more than sufficient punishment in this case to satisfy the statutory requirements. Jeremy is losing his right to vote, his right to hold office, his right to sit on a jury, and his right to possess a firearm. Also, there are many other "collateral consequences" of a felony conviction, under both state and federal law.

> "Criminal conviction brings with it a host of sanctions and disqualifications that can place an unanticipated burden on individuals trying to re-enter society and lead lives as productive citizens. The impact of these "collateral consequences" is often discussed in the context of offender re-entry....[c]ollateral consequences tend to last indefinitely, long after an individual is fully rehabilitated."

***"Beyond the Sentence - Understanding Collateral Consequences", Sarah B. Berson, National Institute for Justice, http://www.nij.gov/journals/272/pages/collateral-consequences.aspx.***

Finally, this conviction has a dramatic and harsh effect upon Jeremy's reputation. He was proud to lead the Veteran's Club as CEO, proud to never take a dime from the organization, and proud to be the face fighting for veteran rights. Now, here he sits at 43 years of age, a convicted felon for a charge that can never be expunged—that will follow him for the rest of his life.

As a testament to his character, not only did those that disliked him at trial still sing his praises, but the defense is supplying this Court with thirty-five (35) character letters, from people of all walks of life. The undersigned would ask this Court to strongly consider the words of these letters, their sources, and the multitude of people from various segments of society that still vouch for his good character, hard work ethic, and high moral standards.

**3. To Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

Jeremy respects that this is a serious felony offense. Quite frankly, he is scared to death of what will happen. Up until the present case he was a faithful and law-abiding citizen. He understands this Court has a duty to impose a sentence that will promote respect for the law and provide just punishment. However, prior to the present case he served his county faithfully, going to war on foreign soil, sacrificing his mental and physical health. He has never been in trouble in his life. He has given his heart and soul to serve the veterans of Kentucky. There is no justice in sending him to prison to serve behind bars. Counselors would request this Court make him continue to serve the veterans of Kentucky, fighting for their rights and the issues they face. That would be the most productive path for all involved, and still promote respect for the law and be a just punishment. The public shaming and stigma that now comes with being a felon has been more than enough punishment.

**4. To Afford Adequate Deterrence to Criminal Conduct and Protect the Public From Further Crimes of the Defendant**

Because of this case, Jeremy has faced public humiliation, shame, and embarrassment. Jeremy's likelihood of reoffending is close to zero percent based upon a variety of factors (prior military service and employment, family support, lack of any prior criminal history, volunteer work, etc.). Taking away his right to own firearms for life, being a convicted felon until the day he dies, losing his right to ever vote again, and having to deal with the public disgrace of this case are more than enough of an adequate deterrence to any future criminal conduct.

Counselors have no qualms telling the Court they have no concern whatsoever that he will ever reoffend. He probably has the lowest chance to reoffend of any defendant either

counselor has represented in their respective careers. Even a well below-guideline sentence would be sufficient to deter any future criminal conduct or behavior.

5. **<u>To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the most Effective Manner</u>**

Sending Jeremy to prison will do nothing to further his education or vocational training. And it certainly will damage his mental and emotional health. The Court heard during trial the numerous mental health medications Jeremy has been treated with and the countless treatment retreats and programs he has attended. Sending him to prison is going to exacerbate the problem, not make it better. It is going to make him relapse, not progress.

The one thing that has done miracles to help his mental well-being is serving the veterans of our community. That is what led him on the road to recovery. That is what gives him hope, meaning, and purpose. To take that away and put him in prison will leave a shell of a man. For a person who has never been to jail and never been in trouble in his life who faithfully served our country and has given thousands of hours thanklessly serving our veterans, putting him in prison with rapists, murders, child pornographers, drug dealers, and con men will do nothing to help Jeremy or help society. If anything, this Court should sentence Jeremy to thousands of hours of continued community service to serve and fight for the veterans of Kentucky. That is the most useful corrective treatment in the most effective manner that will benefit Jeremy and society.

6. **<u>The Kinds of Sentences Available and the Need to Avoid Unwarranted Disparities</u>**

In ***Booker***, the Supreme Court severed and excised ***18 U.S.C. § 3553(b)***, the portion of the federal sentencing statute that made it mandatory for courts to sentence within a particular sentencing guideline range. ***Booker, 125 S. Ct. at 756***. This renders the sentencing guidelines advisory. ***Id.*** Therefore the Court has the authority to impose any sentence it finds satisfies the

statutory sentencing requirements imposed by Congress.

To avoid unwarranted sentencing disparities, the Court should impose a below-guidelines sentence herein. Nationally, 21.8% of offenders in fraud cases in 2016 were granted probation. ***See Exhibit # 3, Table 7, Offenders Receiving Sentencing Options In Each Primary Offense Category, Fiscal Year 2016, U.S. Sentencing Commission***. Nationally, 49% of all federal cases were below the guideline range. ***See Exhibit # 4, Table 8, National Comparison of Sentence Imposed and Position Relative to the Guideline Range, Fiscal Year 2016, U.S. Sentencing Commission***. In the Sixth Circuit in particular, 54.9% of sentences were below the guideline range. ***See Exhibit # 5, Table 9, Sentences Relative to the Guideline Range by Circuit and District, Fiscal Year 2016, U.S. Sentencing Commission***.

The national statistics also show that the sentences in the areas of fraud were primarily below the guidelines. In 2016, 55.2% of all fraud cases were below the guideline range. ***See Exhibit 6, Table 10, Sentences Relative to the Guideline Range by Each Primary Offense Category, Fiscal Year 2016, U.S. Sentencing Commission***.

Therefore, empirical data, drawn from government compiled statistics, show that the Court should impose a below-guideline sentence to avoid any unwarranted disparity. The facts show that most offenders in fraud cases are sentenced well below their own guideline range, regardless of what that range is. Jeremy therefore requests this Court do what is done both nationally and locally and impose a below-guideline sentence for these crimes. To do otherwise would create an inequitable disparity that violates the intent and spirit of the sentencing statute.

### 7. <u>THE NEED TO PAY RESTITUTION</u>

While the restitution owed in this case is substantial, the defense is requesting this Court order that it continued to be paid to the VA via an offset. Jeremy is still a 70 percent disabled veteran entitled to VA benefits. A September 19, 2024, letter sent to Jeremy which was forwarded from defense counsel to the probation officer and is now part of the PSR, denotes that the VA intends to withhold $2,040.28 a month until the amount they determined he owes ($130,777.39) is repaid. The VA notes in the letter how they have automatically placed Jeremy in this recoupment plan and "will withhold [his] full benefit amount until the debt is recouped in full." Restitution, therefore, has already been set and is being handled in this case at a rate of $2,040.28 a month. Given Jeremy's current cash flow denoted in the PSR of -$2,547.00, the defense request this be a sufficient pay back plan and amount. ***See PSR 11-12 at 61.***

## IV. <u>VARIANCE FOR MR. JEREMY</u>

The undersigned respectfully requests this Court consider granting Jeremy a variance, to eight (8) points, to put him in Zone A, and allow him to be given probation or probation with home confinement.

### A. <u>JEREMY SHOULD GET A VARIANCE SINCE THERE ARE FACTORS THAT WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM</u>

Courts may impose a variance outside of the guideline range after consideration of all relevant departure provisions. ***Gall v. United States, 552 U.S. 38, 49 (2007); see also supra note 11***. The ability to vary preserves a district court's ultimate ability to impose a sentence that it views is "sufficient, but not greater than necessary" to serve the goals of sentencing in 18 U.S.C. § 3553(a), regardless of the guideline range. ***See, e.g., United States v. Ortiz-Pérez, 30 F.4th***

***107, 112 (1st Cir. 2022) ("It is the sentencing court's prerogative—indeed, its duty—to 'draw upon [its] familiarity with a case, weigh the factors enumerated in [section] 3553(a), and custom-tailor an appropriate sentence.' " (alterations in original) (quoting United States v. Flores-Machciote, 706 F.3d 16, 20 (1st Cir. 2013)))***.

Jeremy's lack of any prior criminal history, prior service to our country, and the nature and circumstances of the present offense are grounds for the Court to grant a variance, pursuant to the ***18 USC 3553(a)*** factors. The undersigned respectfully prays this Court vary down to a total offense level of eight (8), and allow Jeremy to be probated or given home confinement.

**B. IF THE COURT HOLDS THAT JEREMY IS A ZERO-POINT OFFENDER, AND HIS TOTAL OFFENSE LEVEL IS ELEVEN (11) OR LOWER, THEN THE USSG AMENDMENTS SUGGESTS HE BE GIVEN A SENTENCE OTHER THAN A SENTENCE OF IMPRISONMENT**

The recently adopted amendments state that for Zero-Point Offenders that qualify under ***USSG 4C1.1***, a sentence other than a sentence of imprisonment is generally appropriate, if they are in Zone A or B. Even if the Court were to conclude that Mr. Harrell is a Zone B offender with eleven (11) points, the amended Application Notes regarding a term of imprisonment for Zero-Point Offenders now states:

> 10. Zero-Point Offenders.— (A) Zero-Point Offenders in Zones A and B of the Sentencing Table.—If the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range is in Zone A or B of the Sentencing Table, a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3), is generally appropriate. See 28 U.S.C. § 994(j).
> ***USSG §5C1.1 Imposition of a Term of Imprisonment, Application Notes: 10. Zero-Point Offenders as amended November 1, 2023***.

Because of this law change, the undersigned respectfully requests this Honorable Court consider the above and sentence Jeremy to a term of probation, or at worst, a term of probation

with Home Detention. This would be in the spirit and letter of the law, and in line with recent policy changes that went into effect in November of 2023 to the Sentencing Guidelines.

## CLOSING REMARKS

This is a case of a man who did the wrong thing but for the right reasons. He's not a drug dealer, scam artist, violent felon, or rapist. He's not a con man, a gun runner, pedophile, or child pornographer. He is not who we as lawyers and judges normally see every day in federal court. Jeremy is a man who served our country, serves veterans, loves to help people, who made a mistake. A man who did the wrong thing for the right reason. All Jeremy ever wanted to do was to help veterans and fight for veteran rights. But a jury of his peers decided that he stole from the United States Government. And Jeremy accepts that. But now, for the rest of his life, he must live with the disgrace of being a convicted felon, and the consequences. If the Court feels prison is appropriate, Jeremy has accepted this and will respect that decision. However, the undersigned counselors pray this Court will allow him to stay out of prison and impose any alternative sentence this Honorable Court deems appropriate, consistent with the Sentencing Guidelines.

**WHEREFORE**, the undersigned submits the above Sentencing Memorandum in support of fact, law, and argument, for the upcoming sentencing hearing for Jeremy Harrell on December 9, 2024, in front of this Honorable Court.

Respectfully submitted,

/s/ NICHOLAS D MUDD
____________________________
NICHOLAS D. MUDD
MUDD LEGAL GROUP
600 W MAIN ST, SUITE 300
Louisville, Kentucky 40202
Phone: (502) 795-2529
Nick@MuddLegalGroup.com

/s/ JOHN CASEY MCCALL
____________________________
JOHN CASEL MCCALL
Attorney at Law
600 W MAIN ST, SUITE 300
Louisville, KY 40202
Phone: (502) 724-3404
CMcCall@600MainLaw.com

**CERTIFICATE OF SERVICE**

We hereby certify that a copy of the foregoing motion was filed on December 5, 2024, with service to all parties via ECF.

| | |
|---|---|
| /s/ NICHOLAS D MUDD | /s/ JOHN CASEY MCALL |
| ___________________________ | ___________________________ |
| NICHOLAS D MUDD | JOHN CASEY MCCALL |
| Defense Counsel | Defense Counsel |