**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**FRANKFORT**

**CRIMINAL ACTION NO. 3:23-CR-16-KKC-MAS**
**(Civil Action No. 3:26-CV-43)**

**UNITED STATES OF AMERICA** **PLAINTIFF**

**V.** **RESPONSE OF UNITED STATES TO 28 U.S.C. § 2255 MOTION**

**JEREMY WAYNE HARRELL** **DEFENDANT**

* * * * *

The Court should deny Jeremy Harrell's motion to vacate under 28 U.S.C. § 2255 because he fails to show he received ineffective assistance of counsel. [R. 150: Motion at 2670-89.]

To prevail on an ineffectiveness claim, a defendant bears the burden of showing that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's ineffectiveness prejudiced his defense so as to deprive him of his right to a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A § 2255 petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel. If the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Id*. at 697. A petitioner must prove his allegations by a preponderance of the evidence. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

To show deficient performance, a defendant "must prove that counsel's representation was not merely below average, but rather that it 'fell below an objective

standard of reasonableness.'" *United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) (quoting *Strickland*, 466 U.S. at 688). Courts "employ a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id*. (quoting *Strickland*, 466 U.S. at 689).

To prove prejudice, a defendant "must demonstrate that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] would have been different.'" *Dado*, 759 F.3d at 563 (alteration in original) (quoting *Strickland*, 466 U.S. at 694). "When determining prejudice, a court must consider the errors of counsel in total, against the totality of the evidence in the case." *United States v. Munoz*, 605 F.3d 359, 377 (6th Cir. 2010). "Reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Dado*, 759 F.3d at 563 (quoting *Strickland*, 466 U.S. at 694). Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 691). Proving ineffective assistance of counsel "is *never* an easy task." *Carter v. Parris*, 910 F.3d 835, 838 (6th Cir. 2018).

The Sixth Circuit described the basic case background:

> Harrell served in the military from 1999 to 2008 and received an honorable discharge. In April 2011, Harrell began receiving [individual] unemployability [(IU)] benefits from the Department of Veterans Affairs (VA). These benefits compensate veterans who are unemployable due to service-related disabilities, but recipients must notify the VA immediately if they become employable. In January 2019, Harrell founded [and was CEO of] a nonprofit organization[, Veterans Club, Inc. (VC),] for which Harrell routinely worked around 40 hours a week. Because Harrell was

> able to be gainfully employed, he was ineligible for [IU] benefits. But Harrell did not report this change in employability status to the VA.

*United States v. Harrell*, 180 F.4th 888, 894 (6th Cir. 2026). Not only did he not report the change; he, further, turned to affirmative lies to continue on the government dole. "On or about September 14, 2022, during a VA Compensation and Pension (C&P) Evaluation, Harrell made false statements about his true work activity on behalf of VC." [R. 76: Presentence Report at ¶ 16.] "For example, Harrell"—again, VC's Founder and CEO—"stated that he merely did 'some things' with VC." [*Id.*] "When asked how frequently he participated in veterans' activities, Harrell responded, 'It is not a regular thing, just occasionally.'" [*Id.*] "When asked how many times he volunteered in the past thirty days, Harrell reported that he volunteered once." [*Id.*] "At the time Harrell made these misrepresentations in the C&P Evaluation, he knew he had engaged in multiple VC-related activities in at least the preceding thirty days." [*Id.*; *see* R. 87: James Chapman, TR (Trial Day 5) at 2207-41 (cataloguing evidence of Harrell's guilt); R. 30: Brief, *United States v. Harrell*, No. 24-6148 (6th Cir.) at pp. 1-5, 9-25 (same).]

"A grand jury indicted Harrell." *Harrell*, 180 F.4th at 894. He went to trial; the jury convicted. [R. 49: Verdict Form at 203.] The Court sentenced him to six months in prison, followed by one year of supervision. [R. 68: Judgment at 1030-32.] The Sixth Circuit affirmed his direct appeal. [R. 112: Order at 2495-99.] The Court "imposed restitution in a later amended judgment, from which Harrell [did] not appeal[.]" [*Id.* at 2497.] The Court imposed forfeiture in another amended judgment; Harrell appealed, and the Sixth Circuit, again, affirmed. *Harrell*, 180 F.4th at 908. A § 2255 motion,

raising four general claims of ineffective assistance of counsel, pends. [R. 150: Motion at 2670-89.] The motion fails.

*First*, Harrell argues that counsel was ineffective for failing to file a notice of appeal from the amended judgment imposing restitution. [R. 150: Motion at 2679-81.]

In general, at least in cases where the defendant wants to appeal his conviction or sentence, "an attorney performs deficiently if, after consulting with his client, he disregards specific instructions from his client to file a notice of appeal—a purely ministerial task." *Pola v. United States*, 778 F.3d 525, 533 (6th Cir. 2015). But "an attorney's performance is not per se deficient simply because he does not consult with his client about the benefits and drawbacks of an appeal." *Id.* "In that case, [the Court] must determine whether the attorney should have consulted with his client about an appeal because either (1) a rational defendant would want to appeal, or (2) the defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.*

The nuance here is that the notice of appeal Harrell complains about relates solely to restitution. The Sixth Circuit has already twice reviewed Harrell's case, affirming both times. [R. 112: Order at 2495-99;] *Harrell*, 180 F.4th at 908. But the Circuit, applying *Manrique v. United States*, 581 U.S. 116, 125 (2017) (holding "that a defendant who wishes to appeal an order imposing restitution in a deferred restitution case must file a notice of appeal from that order"), did not address restitution in the first appeal. [R. 112: Order at 2497-98.][1] The government is unaware of any (and Harrell cites no)

[1] In yet another nuance, Harrell, again, had a second, post-restitution-imposition

case addressing a claim of ineffective assistance of counsel based on a failure to file a notice of appeal from an amended judgment imposing restitution when the court of appeals initially applied *Manrique* and declined to address the restitution merits and when the defendant had a separate appeal after the imposition of restitution where he did not even attempt to contest restitution.[2] The Court is, in effect, writing on a blank slate, within the broad guideposts adjacent case law offers.

Returning to first principles, a § 2255 movant must be "claiming the right to be released." 28 U.S.C § 2255(a); *see Duggins v. United States*, 240 F.2d 479, 484 (6th Cir. 1957). Thus, "the plain terms of § 2255 tell [the Court] that [it] may not use the statute to correct errors that cannot affect a petitioner's release from custody." *Amaya v. United States*, 71 F.4th 487, 490-91 (6th Cir. 2023) ("To attack a final judgment through a § 2255 petition, Amaya must claim the right to be released from custody."). So a "challenge to a restitution order is not cognizable in a motion to vacate under § 2255." *United States v. Washington*, No. 97-2160, 1998 WL 898878, at *2 (6th Cir. Dec. 17,

---

appeal where he did not even seek to dispute restitution. [*See* R. 20: Brief, *United States v. Harrell*, No. 25-5556 (6th Cir.).] Any such effort, in these uncharted waters, would likely have been litigated. But Harrell had an at least arguable chance to seek to contest restitution on appeal and did not do so. *Cf., e.g.*, *Lee v. United States*, 149 F.4th 981, 986 (8th Cir. 2025); *United States v. Anthony*, 25 F.4th 792, 803-05 (10th Cir. 2022). This could provide a separate basis for denial of Harrell's claim.

[2] In one case, the defendant argued "that counsel was ineffective for failing to file a second notice of appeal after this Court entered its restitution order." *United States v. Donohue*, No. 1:15 CR 263, 2018 WL 5848908, at *6 (N.D. Ohio Nov. 8, 2018). The Sixth Circuit had affirmed restitution on "the merits" because "*Manrique* was not decided until after the amended judgments . . . were entered." *Id.* So "even if the failure to file a second notice was deficient, Petitioner cannot establish prejudice." *Id.*

1998). But the Circuit, without engaging the § 2255 text, has permitted "a petitioner to contest a restitution order under § 2255 based on a meritorious ineffective assistance of counsel claim." *Weinberger v. United States*, 268 F.3d 346, 351 n.1 (6th Cir. 2001).

Harrell does not invoke *Weinberger*'s atextual exception; he does not, for instance, claim that counsel ineffectively litigated restitution. Rather, Harrell claims that counsel ineffectively *failed to file a notice of appeal* regarding restitution. *Cf. United States v. Thiele*, 314 F.3d 399, 401-02 (9th Cir. 2002). *Weinberger* does not control (or even address) this separate issue. *Weinberger* is, accordingly, "not to the contrary" of the result argued for here. *Amaya*, 71 F.4th at 490 n.3.[3] The Court should not expand *Weinberger*'s defective reasoning to a new context, on this question of first impression, when it need not do so. *See, e.g.*, *id.*; *United States v. Mayhew*, 995 F.3d 171, 183 (4th Cir. 2021) ("Based on this statutory text, virtually all federal courts of appeals to address

[3] Neither is the sought result inconsistent with *Ratliff v. United States*, 999 F.2d 1023 (6th Cir. 1993). *Ratliff*'s relevant discussion concerned a cause-and-prejudice analysis based on an alleged waiver, premised on the defendant pleading guilty "and first assert[ing] a claim for relief in a collateral proceeding." 999 F.2d at 1025. The Circuit, rather opaquely, said that a "refusal to appeal an erroneous restitution award, which award would have been subject to reversal on appeal, would meet the *Strickland* test and would clearly constitute cause for Ratliff's failure to appeal the award." *Id.* at 1026. It was "obvious that Ratliff will suffer actual prejudice" since "he will be forced to pay an award of restitution which could not otherwise be upheld." *Id.* So *Ratliff* supports two propositions: (1) that a failure to file a notice of appeal of an "erroneous" restitution award can be cause for failing to raise the issue on appeal, and (2) the underlying restitution merits (as in *Donohue*) come into the analysis on both cause and prejudice. *Id.* Only a refusal to appeal an "erroneous" restitution award constituted cause, and only an "award" that "would have been subject to reversal on appeal" led to prejudice. *Id.* *Ratliff*, like *Weinberger*, did not broadly hold that a mere failure to file a notice of appeal as to restitution constituted ineffective assistance, which was not at issue. Because *Ratliff* did not address such a claim, it likewise never grappled with the § 2255 text.

the issue have concluded that challenges to restitution orders generally are not cognizable under § 2255. . . . There is one exception: The Sixth Circuit in *Weinberger* . . . allowed an ineffective assistance challenge to a restitution order to proceed under § 2255. But neither *Weinberger* nor the prior circuit precedent on which it relied provided any reasoning for this decision, and in our view, it cannot be squared with the plain import of § 2255's text.").[4]

The result of Harrell's claim (assuming its correctness) would be that he is "entitled to" a direct restitution appeal. *Pola*, 778 F.3d at 531. The most that the appeal (again, assuming Harrell's success) would accomplish is either reducing or eliminating Harrell's restitution obligation; it could not even potentially affect his conviction or any other part of his sentence. It is not, thus, possible, unlike in a standard failure-to-file-a-notice-of-appeal case, for Harrell to "be released" as a result of the desired appeal and, thus, as a result of the ineffective-assistance-based-on-a-failure-to-file-a-notice-of-appeal claim. § 2255(a); *see, e.g.*, *United States v. Saunders*, No. 25-3634, 2026 WL 1847503, at *3 (6th Cir. June 26, 2026) ("[T]he failure to file a notice of appeal doesn't affect the accuracy or integrity of Saunders's conviction or sentence."). Because "the plain terms of § 2255 tell [the Court] that [it] may not use the statute to correct errors that cannot affect a petitioner's release from custody," the Court should deny this claim, even

[4] Harrell asserts that he was "without representation during the critical window of" time for filing a notice of appeal. That is not correct. [*See* R. 110: Response at 2485 n.3.] But, if it is correct, Harrell could not receive ineffective assistance of counsel if he had no counsel. *See, e.g.*, *Wilson v. Parker*, 515 F.3d 682, 696-708 (6th Cir. 2008) (pro se defendant could not raise ineffective assistance claims).

assuming that counsel did not file a notice of appeal that Harrell desired. *Amaya*, 71 F.4th at 490; *cf. United States v. Watroba*, 56 F.3d 28, 29 (6th Cir. 1995); *see also Roe v. Flores-Ortega*, 528 U.S. 470, 485 (2000) (emphasizing, as "with all applications of the *Strickland* test," the inquiry's fact-dependent and case-by-case nature). That's because "the prejudice required to obtain relief must ultimately relate to the challenged custody." *Amaya*, 71 F.4th at 491. Harrell, like Amaya, makes "no argument" that granting him a restitution appeal "would affect his custody because his sole request for monetary relief does not suffice." *Id.* "So he has not shown the kind of prejudice that could state a claim under the plain terms of § 2255." *Id.*; *see also, e.g.*, *Kaminski v. United States*, 339 F.3d 84, 85 n.1 (2d Cir. 2003) (rejecting argument that "counsel was ineffective both in failing to object to the restitution order at trial and in failing to appeal the order" because "§ 2255 does not provide a jurisdictional basis for a challenge to a non-custodial order of restitution").

The traditional justification in typical failure-to-file-notice-of-appeal cases for applying a presumption of prejudice and "reject[ing] attempts to condition the restoration of a defendant's appellate rights forfeited by ineffective counsel on proof that the defendant's appeal had merit" is, essentially, that "because so much is unknown at the notice-of-appeal stage," and because "it is not the defendant's role to decide what arguments to press," the Court simply cannot know what arguments will be raised, how the court of appeals will process them, and what the impact will be on the conviction or sentence. *Garza v. Idaho*, 586 U.S. 232, 244-45 (2019). In other words, determining

prejudice is usually impossible before letting the vagaries of the "entire appellate proceeding" play out. *Id.* at 244; *see Roe*, 528 U.S. at 486. But these generalized concerns are not specifically present here. The Court knows, unlike in a typical case, and per the § 2255 and prior appellate papers, that this belated *Manrique* appeal would be limited to the issue of restitution. *Cf. United States v. Pembrook*, 79 F.4th 720, 730 (6th Cir. 2023); *United States v. McKinley*, 227 F.3d 716, 718 (6th Cir. 2000); *United States v. Adesida*, 129 F.3d 846, 849-50 (6th Cir. 1997). The Court likewise knows that, no matter how creative the appellate lawyering or judging gets, no restitution challenge will impact Harrell's conviction or any other part of his sentence. First principles and applicable case law, thus, counsel in favor of applying *Amaya*'s plain-language, release-from-custody tenets over general precepts that may apply in a mine-run failure-to-file-notice-of-appeal case, but do not pertain to this particular case.

Alternatively, per *Donohue* and *Ratliff*, the Court could deny the ineffective-assistance claim on a more conventional prejudice analysis. 2018 WL 5848908, at *6 (not applying presumption of prejudice in failure-to-file-notice-of-appeal claim and instead assessing prejudice based on merits of underlying restitution claim); 999 F.2d at 1026 (only refusal to appeal "erroneous" restitution award constituted cause and only award that "could not otherwise be upheld" led to prejudice). Harrell's only substantive argument invokes *United States v. Gray*, 121 F.4th 578 (6th Cir. 2024).[5] [R. 150:

[5] *Gray*, by its own terms, does not apply to Harrell's case. The "key phrase" in *Gray* was "the course of the conspiracy," 121 F.4th at 586-87, but Harrell was not charged with a conspiracy. So *Gray*'s analysis, homed in on the specific restitution rules

Motion at 2680-81.] But *Gray*, which addressed loss from before a conspiracy began, is inapposite. "Gray's criminal scheme began in 2015." 121 F.4th at 582. The indictment did not reference "any conduct before 2015." *Id.* at 587. A "conspiracy that began in 2015 does not cause losses in 2004." *Id.* "The restitution order," accordingly, "should not have covered losses before January 2015." *Id.* Here, the Court did not impose restitution for loss prior to the start of Harrell's "criminal scheme." *Id.* at 582. [*See, e.g.*, R. 1: Indictment at 10-12; *see* R. 76: Presentence Report at ¶¶ 18-23, 75.] *Gray* impacts nothing about Harrell's case; it does not stand for the proposition—Harrell's only substantive argument against restitution—that "benefits received before the indictment" are not properly the subject of restitution. [R. 150: Motion at 2680.] *Gray*'s dividing line is the start of the criminal scheme, not the date of indictment. 121 F.4th at 582, 587.[6] It would be illogical to let fraudsters like Harrell keep money raked in due to their

---

that apply in conspiracy cases, is facially inapplicable here.

[6] This result is even clearer because, in a direct restitution appeal like Harrell seeks, the Sixth Circuit would review the issue for plain error. *Gray* existed at the time of Harrell's sentencing, but Harrell did not raise a no-restitution-for-loss-prior-to-indictment argument. [*See, e.g.*, R. 89: Order at 2419 ("Harrell has not submitted a filing on restitution. . . . To the extent additional objections exist, the Court gave Mr. Harrell an opportunity to raise them, and he failed to do so.").] "[S]o [the Sixth Circuit would] review this new argument for plain error." *United States v. Page*, 163 F.4th 385, 398 n.3 (6th Cir. 2025); *see Gray*, 121 F.4th at 585 ("Because Gray did not raise this point below, he must show a plain error."). At a minimum, per the above discussion, any error would not "be clear or obvious, rather than subject to reasonable dispute." *Puckett v. United States*, 556 U.S. 129, 135 (2009). The fourth plain-error prong would also likely not be met. *See id.* Further, even under the typical standard of review, "the findings of fact underlying the district court's loss calculations—both for Guidelines enhancement and restitution purposes—will be overturned only if clearly erroneous." *United States v. White*, 492 F.3d 380, 414 (6th Cir. 2007). The Court, by "adopt[ing] and accept[ing] the

criminality prior to indictment. The government also incorporates its refutation of the merits of Harrell's loss and restitution arguments in his first appeal, [*see* R. 30: Brief, *United States v. Harrell*, No. 24-6148 (6th Cir.) at pp. 25-41; *see also* R. 57: Sentencing Memorandum at 222-37; R. 77: Response at 1083,] as well as the Sixth Circuit's prior refutation of his loss arguments. [R. 112: Order at 2497.]

*Second*, Harrell faults counsel for "fail[ing] to present" three pieces of evidence at trial. [R. 150: Motion at 2681-83.] First up is the "February 20, 2024 VA DHO hearing transcript." [*Id.* at 2681-82.] He wanted this evidence in to show his "attorney arguing to a VA hearing officer that [he] remained entitled to IU benefits." [*Id.* at 2682.] There are many things independently wrong with this argument. First, the statements would be hearsay—out-of-court statements being introduced for their truth (that Harrell remained entitled to IU benefits). Fed. R. Evid. 801(c). Such statements are not admissible. Fed. R. Evid. 802; *see, e.g.*, *Exxonmobil Global Servs. Co. v. Bragg Crane Serv.*, No. 4:21-cv-03008, 2023 WL 6274764, at *6-7 (S.D. Tex. Sept. 26, 2023) ("I will not allow any transcripts from the CAL OSHA proceedings into evidence in this case, as they are

---

findings that are contained in th[e] presentence report," [R. 88: Court, TR (Sentencing) at 2354; *see also id.* at 2308 (noting that the indictment "starts in January 2019 . . . as a time frame"), 2341 (further timing findings),] found that Harrell's criminal scheme began in "late January 2019." [R. 76: Presentence Report at ¶¶ 12, 18-19.] That finding, per the above discussion and when considering the PSR content and case evidence, is not clearly wrong. [*See, e.g.*, Government Trial Exhibit 4M ("[I]ndividual unemployability benefits are proposed to be terminated effective January 28, 2019 based on fraud.").] Indeed, the Sixth Circuit has already affirmed counting loss "from January 2019 to August 2024," [R. 112: Order at 2497,] and stated that Harrell's criminality began in "January 2019," 180 F.4th at 894.

hearsay statements."); *Matter of Sterling Nav. Co., Ltd.*, 444 F. Supp. 1043, 1046-47 (S.D.N.Y. 1977); *Strong v. Dexter*, No. CV 07-06103-ABC (VBK), 2008 WL 1781362, at *7 (C.D. Cal. Apr. 17, 2008). Admitting a transcript would not have permitted cross-examination of the speaker to expose the inaccuracy of his beliefs; even if Harrell would prefer returning to "the 16th and 17th century practice of trial by affidavit," the Court will not countenance it. *United States v. Kaufman*, 546 F.3d 1242, 1252 (10th Cir. 2008). Second, "lawyers' statement and arguments are not evidence." [R. 47: Jury Instructions at 170.] Third, the arguments would be repetitive in purpose to the arguments Harrell's lawyers made at this very trial—that he was still entitled to IU benefits and had committed no fraud. Fourth, in any event, "the jury" would not have been "bound by that administrative process." [R. 88: Court, TR (Sentencing) at 2300.] Fifth, the arguments are, as explained ad nauseum at trial, on appeal, and in numerous court filings, legally incorrect. The key was not whether Harrell made money for his work; it was whether he was capable of work. [*See, e.g.*, R. 87: James Chapman, TR (Trial Day 5) at 2211-14.] Harrell's role as the active and successful "[F]ounder and CEO of a non-profit that generates and handles $400,000 and more a year, and has over 6,000 members"—considered with all the other evidence presented in the case—easily showed his ability to work. [*Id.* at 2262.] So there is no deficient performance.

For many of the same reasons, Harrell proves no prejudice. Even if the jury had seen a transcript of a lawyer arguing that Harrell remained entitled to IU benefits, Harrell does not prove there is a reasonable likelihood that would have changed the outcome of

trial. His lawyers argued the same at this trial, and the jury still convicted. And in light of the overwhelming evidence of his guilt, Harrell does not prove that the jury having this one transcript would have been reasonably likely to sway the jury from conviction to acquittal. The jury was well aware that Harrell was asserting he was still entitled to IU benefits both at this trial and in a then-ongoing administrative proceeding. [R. 84: Colloquy, TR (Trial Day 2) at 1446-47.] The jury knew that Harrell "ha[d] requested to have a hearing with VA, and he did have that hearing, so that hearing transcript is in his file now, and now we're just in a holding pattern now that we're here today." [*Id.* at 1365-66.] The jury knew that Harrell was still receiving his IU benefits at the time of trial because he was administratively fighting the decision to end the benefits, making the administrative decision "not final" due to his appeal. [*Id.* at 1366.] Harrell proves no ineffectiveness on either prong.

Next up is the "SSA Special Determination dated April 29, 2022." [R. 150: Motion at 2682.] Harrell concedes this "was admitted into evidence at trial." [*Id.*] So, by his own concession, his assertion that counsel "fail[ed] to present" this document is wrong. [*Id.* at 2681-82.] Regardless, far from "clear[ing] [Harrell] on the same issue the government characterized as criminal," [*id.* at 2682,] the SSA—after learning the truth of Harrell's work activity—"terminated his benefits." [R. 86: Colloquy, TR (Trial Day 4) at 1817.] Harrell had not "disclose[d]" to the SSA "by April 2022" that "he was the CEO and Founder of Veteran's Club." [*Id.* at 1818; *see, e.g.*, Government Trial Exhibits 4K & 4L (showing Harrell and his wife lying to SSA).] So the April 2022 determination was

based on inaccurate and incomplete information, as the SSA later recognized when terminating benefits. As the government said, this "document does not tell the full story of [Harrell]'s Social Security benefits." [R. 84: James Chapman, TR (Trial Day 2) at 1429-30.] Further, the SSA and the VA benefits utilized different tests; qualification for one was not "the same issue," [R. 150: Motion at 2682,] as qualification for the other. [R. 83: Tyler Rothstein, TR (Trial Day 1) at 1258 ("Their criteria is a little different than ours, but somewhat similar. We don't just say, well, Social Security granted or denied, that's what we're going to do."); *id.* at 1259 (further explaining why); R. 86: Colloquy, TR (Trial Day 4) at 1818 (Q: "[D]oes entitlement to IU, is that based on accountable income test?" A: "No.").] Harrell proves no deficient performance or prejudice.

Last up is "Dr. Macobin's October 5, 2022 letter." [R. 150: Motion at 2682.] This was also admitted into evidence. [*See* R. 84: Colloquy, TR (Trial Day 2) at 1441-42.] So Harrell's complaint that counsel "fail[ed] to present" this letter is, again, wrong. [R. 150: Motion at 2681-82.] Dr. Macobin was discussed at length during trial. [*See, e.g.*, R. 84: Colloquy, TR (Trial Day 2) at 1362-63, 1440-42, 1458-59; R. 87: Colloquy, TR (Trial Day 5) at 2123-26, 2134-35.] Dr. Macobin's "letter was written on [Harrell]'s behalf at [Harrell's] request," without considering the "evidence collected" in the investigation. [R. 84: Colloquy, TR (Trial Day 2) at 1362-63.] The evidence collected was "more persuasive" than a self-interested letter, written based on incomplete and inaccurate information. [*Id.* at 1363.] Dr. Macobin had also not completed a C&P Evaluation of Harrell. [*Id.* at 1459.] His letter did not even "mention Mr. Harrell's

involvement with Veteran's Club." [R. 86: Colloquy, TR (Trial Day 4) at 1983.] And he would not be "unbiased in [his] opinions since [he] w[as] [Harrell's] therapist and ha[d] to maintain that therapeutic relationship." [R. 87: Sofia Marsano-Josefowicz, TR (Trial Day 5) at 2126; *see id.* at 2146-51 (describing why "it's recommended against for a therapist to write a statement" like Dr. Macobin wrote).] Harrell proves no ineffectiveness on either prong.

As to Harrell's musings about good faith, the Court considered a good-faith instruction at length. [*See, e.g.*, R. 86: Colloquy, TR (Trial Day 4) at 2009-24, 2031; R. 87: Colloquy, TR (Trial Day 5) at 2039-47, 2161-62.] Harrell engages none of that careful analysis. A good-faith instruction is not proper for a theft of government property charge like Harrell faced. *United States v. Stephens-Miller*, 582 F. App'x 626, 636-37 (6th Cir. 2014). [*See* R. 86: Court, TR (Trial Day 4) at 2014 (expressing concern "about confusion with the jury with a good faith instruction").] Harrell's attorneys argued passionately—literally tearing up in closing argument—that he was innocent, that he did not "knowingly and intentionally" commit fraud, and the like, thus raising just the sort of lack-of-intent/mens-rea/good-faith defense that he wanted. [R. 87: Casey McCall, TR (Trial Day 5) at 2241-58; *see also* R. 83: Nicholas Mudd, TR (Trial Day 1) at 1237-44 ("The government rated him as unemployable, that he couldn't work. He follows what the government told him. And if that is somehow stealing, that's completely wrong.").] And even if it was error to not include a good-faith instruction, the error would be harmless for substantially the same reasons *Stephens-Miller* describes. 582 F. App'x at

637-38. The core problem for Harrell is that his "repeated misrepresentations showed that he knew that he was wrongfully obtaining disability benefits." [R. 112: Sixth Circuit Order at 2496.] *See* Sixth Circuit Pattern Jury Instruction 10.04(3) (providing that defendant "does not act in good faith" if he "knowingly makes false or fraudulent pretenses, representations, or promises to others"). After all, "if he didn't think he was doing something wrong, why lie about it?" [R. 87: James Chapman, TR (Trial Day 5) at 2261.] The Court required jury findings of numerous Harrell mentes reae, permitting just the sort of argumentation concerning his intent and mindset that a good-faith instruction would allow. [R. 47: Jury Instructions at 178-79.] Harrell challenges none of this and proves no ineffectiveness.

*Third*, Harrell says that counsel "inadequate[ly] prepar[ed] and deploy[ed]" expert Robert Piper. [R. 150: Motion at 2683-85.] Harrell, in essence, blames his counsel for the effectiveness of the government's cross-examination of Piper and for not sufficiently coaching Piper's testimony. [*Id.*] The Court should reject these arguments. No witness is a party's mouthpiece, regurgitating the party's case theory to the jury. And no counsel, as any trial lawyer knows, controls how a witness testifies on the stand. This scenario, instead, exemplifies the Supreme Court's wisdom that cross-examination is "the greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970). Harrell's contrary claims betray his disdain for our justice system and the truth-seeking goal of trial. As the Sixth Circuit pithily summarized in a failure-to-

prepare-witnesses case, "this argument is not well taken." *Hill v. Mitchell*, 842 F.3d 910, 943 (6th Cir. 2016).

First, Harrell criticizes Piper's "[e]xclusive reliance" on information obtained from him (Harrell). [R. 150: Motion at 2684.] That's wrong; Piper relied on numerous sources of information. [R. 86: Colloquy, TR (Trial Day 4) at 1965-74 (detailing qualifications and various bases of knowledge and documents he reviewed).] Harrell does not identify any other specific information Piper should have consulted. To the extent Harrell recognizes that he "fed" Piper "a pack of lies," [R. 87: James Chapman, TR (Trial Day 5) at 2230,] he is correct. That is Harrell's fault, not his lawyers'. *See, e.g.*, *Hill*, 842 F.3d at 943 (stating that, while witnesses presented "sometimes-conflicting accounts," "that was *not* the result of deficient . . . preparation on the part of defense counsel. Rather, it was the product of reality."); *Walters v. United States*, Nos. 15-cr-644 (AJN), 20-cv-10763 (AJN), 2022 WL 890906, at *5 (S.D.N.Y. Mar. 25, 2022) (rejecting failure-to-prepare-expert claim). So there is no deficient performance. Harrell should get no § 2255 benefit for lying to his own expert. There is also no prejudice; if Piper had reviewed the investigation evidence, for example, his opinion would have changed. [R. 86: Colloquy, TR (Trial Day 4) at 1996-97.] At least Harrell got Piper's defense-friendly opinion in the record for the jury to consider. [*Id.* at 1973-74, 1993.] Piper relying on the investigation evidence (given that it is against Harrell) would have hurt Harrell more than helped, as every other case actor objectively looking at the case has concluded. [*See id.* at 1996 ("[I]t would change my opinion, certainly, if I knew these

were the facts and not something else.").] Indeed, and as a general criticism, Harrell does not provide a supplemental, post-additional-evidence-review Piper report, or any alternative expert report, to back up his claims. *Cf. White v. Mitchell*, 431 F.3d 517, 528 (6th Cir. 2005).

Harrell also references "a contact prohibition" and that he had not met Piper in person. [R. 150: Motion at 2684.] He says he "was subject to a court-ordered prohibition on contact with Veterans Club." [*Id.*][7] But he does not claim (or cite record evidence) that Piper was a member of VC, so he does not establish that the alleged contact prohibition had any effect. Indeed, he had two interviews with Piper with no adverse consequences. [*See id.*] Piper didn't even know about the alleged condition. [R. 86: Colloquy, TR (Trial Day 4) at 1997.] And the fact that Piper had not met Harrell in person had no logical (or Harrell-explained) impact. (Further, that Piper had not met Harrell in person provides further support for him not being a VC member, as do his belief that Harrell's wife ran VC and his lack of knowledge of Harrell's VC title. [*Id.* at 1980-81.]) Whether the duo met in person or over the phone was not the key. The key was Piper's partial reliance on Harrell's self-reporting—whether the information came from phone calls or in-person meetings was not critical.

[7] He cites no such prohibition. That is an inaccurate interpretation of condition 7(g), if that is even the condition he is referencing. [*See* R. 51: Response at 206-07.] That condition, too, has an exception for contact in the presence of counsel. [*See id.*] Harrell was under no obvious condition as to Piper, as his own actions (conducting two interviews with him, to no consequence) demonstrate. Harrell cites no specific instance of a desired contact or in-person meeting with Piper that he was unable to have due to an unspecified bond condition.

Second, Harrell thinks that "[c]ounsel had a responsibility to brief Piper on the regulatory standard before trial." [R. 150: Motion at 2684.] True, Piper did not know the standard for IU benefits. [R. 86: Colloquy, TR (Trial Day 4) at 1993-94.] But an expert is qualified based on *his own* "knowledge, skill, experience, training, or education," or, said another way, "*the expert's* scientific, technical, or other specialized knowledge," not the knowledge, experience, training, or education fed to him by defense counsel. Fed. R. Evid. 702(a) (emphasis added); *see United States v. Barber*, ___ F.4th ___, 2026 WL 2364330, at *2 (6th Cir. Aug. 14, 2026) (per curiam) ("his"). Counsel has no obligation to coach an expert witness how to testify; quite to the contrary, witness coaching is improper. *See, e.g.*, *Geders v. United States*, 425 U.S. 80, 89-90 & n.3 (1976) (referring to "the problem of possible improper influence on testimony or 'coaching' of a witness" and "the ethical limits on guiding witnesses"). [R. 83: James Chapman, TR (Trial Day 1) ("I certainly don't put words in my witnesses' mouths.").] Harrell, in asserting otherwise, misunderstands experts' role. Their testimony is not based on what defense counsel tell them to say; their testimony is based on their own "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Telling a witness how to testify is manifestly not the role of counsel. So there is no deficient performance. There is also no prejudice. If Piper had known the IU standard (and been fully factually informed), he would have agreed—as has every other case actor objectively looking at the case—that Harrell did not qualify. So, again, a less-fully-

informed Piper was at least able to get his defense-friendly opinion before the jury. If Piper had known the IU standard, it would have hurt Harrell more than helped.

Third, Harrell gripes that Piper agreed that, "if his factual predicates were false, his opinion might change." [R. 150: Motion at 2684.] The facts may not matter to Harrell, but they do matter to experts, just as they mattered to Piper. Piper giving the opposite answer—that the facts don't matter and that factual changes would not have altered his opinion—would have, if anything, damned Harrell's defense. Piper would have lost all credibility with the jury, since different factual circumstances obviously lead to different employability conclusions. In the end, whether Harrell blames counsel for the answers Piper gave or the effectiveness of the government's cross, neither is under counsel's control, and he proves no deficient performance.

Harrell also proves no prejudice. Piper allowed (in the statement Harrell complains about) that a factual difference "might" change his opinion—hardly a full-throated concession of Harrell's position. [R. 86: Colloquy, TR (Trial Day 4) at 1996-97.] So, arguably, Piper stuck by Harrell through it all. But even reading it the other way, an opposite answer—that the facts didn't matter—would have, again, hurt Harrell more than helped, given how unreasonable it would have made Piper look. Regardless, given the overwhelming evidence of Harrell's guilt and Dr. Marsano's unimpeached expert opinion, the jury would have, in any event, rejected Piper's opinion and convicted Harrell. [*See, e.g.*, Government Trial Exhibits 4I & 4J.] So he doesn't prove that the result of trial would have been different in this counterfactual situation.

To the extent Harrell says that counsel should have "prepared Piper to explain why" his (Harrell's) "uncompensated, therapeutic activity" was different from "substantial gainful employment," [R. 150: Motion at 2584], that ties back to Harrell's legally-incorrect understanding of substantially gainful employment, as explained in more detail above and below. Counsel properly did not coach Piper to parrot Harrell's incorrect talking point. If counsel had, the government would have vigorously cross-examined Piper (as it likewise would have on the issues raised above) and exposed the theory's hollowness. *See Geders*, 425 U.S. at 89-90 ("Skillful cross-examination could develop a record which the prosecutor . . . might well exploit [if] defense counsel had in fact coached the witness as to how to respond on . . . cross-examination."). Regardless, Piper made the point Harrell desired. [R. 86: Robert Piper, TR (Trial Day 4) at 1973-74 ("[I]t was a therapeutic situation for him to be in. So I don't consider it a clear-cut job."); *see also* R. 87: Colloquy, TR (Trial Day 5) at 2141-42.] So there is no deficient performance or prejudice. Again, Piper was not a bullhorn for Harrell's theory of the case. Piper, following the proper role of an expert, testified based on his own knowledge, training, and experience. The notion that counsel should have spoon-fed Piper certain responses, instead of relying on him to truthfully answer questions, strikes to the heart of, and reveals Harrell's contempt for, our very system of justice. The Court should reject Harrell's arguments.

*Fourth*, Harrell complains of counsel's "failure to request [a] jury instruction on the regulatory definition of substantially gainful employment." [R. 150: Motion at 2685-

86.] But the regulatory definition was explained to the jury in testimony and exhibits. [*See, e.g.*, R. 83: Colloquy, TR (Trial Day 1) at 1266-67; R. 84: Colloquy, TR (Trial Day 2) at 1357-59; Government Trial Exhibits 1 & 4M.] So too was the poverty-threshold issue. [*See, e.g.*, R. 83: Colloquy, TR (Trial Day 1) at 1261-65; R. 84: Colloquy, TR (Trial Day 2) at 1359, 1405, 1409-10, 1433-39; Government Trial Exhibits 1 & 4M; *see* R. 87: James Chapman, TR (Trial Day 5) at 2211-14.] There was no dispute about the administrative definition of substantially gainful employment or these issues in general. Harrell cites no case supporting the proposition that a district court should instruct on the definition of a phrase where there is no dispute about the definition, the phrase is not otherwise used in the jury instructions, and the phrase is not in the criminal statute charged.[8] In these circumstances, there is no reasonable dispute that "the instructions, viewed as a whole, were [not] confusing, misleading, or prejudicial." *United States v. Shelton*, 179 F.4th 1020, 1034 (6th Cir. 2026). Counsel did not deficiently perform.

Harrell also proves no prejudice. Again, there was no dispute about the regulatory definition. A jury instruction reiterating that definition would have changed nothing about the trial. Harrell certainly does not prove, with the unchallenged definition in evidence, that had the Court given an additional instruction on the definition, the result of the trial would have been different. *See, e.g.*, *Martinez-Arrellano v. United States*, Nos.

[8] Harrell cites 38 C.F.R. § 4.16(a), but "§ 4.16(a) does not define specifically what substantially gainful employment is." *Faust v. West*, 13 Vet. App. 342, 355 (2000).

1:10-CR-59, 1:13-CV-201, 2016 WL 4487749, at *4 (E.D. Tenn. Aug. 25, 2016). The root problem with Harrell's arguments (to reiterate yet again a point he refuses to grapple with) is that qualification for IU benefits doesn't ask if the claimant is *in fact* engaged in substantially gainful activity; it asks whether he is *capable of* substantially gainful activity—*i.e.*, whether he is employ*able*. [*See, e.g.*, R. 83: Colloquy, TR (Trial Day 1) at 1257-65; R. 87: James Chapman, TR (Trial Day 5) at 2211-14.] So whether Harrell received money for his work was not the question. [*See, e.g.*, R. 83: Colloquy, TR (Trial Day 1) at 1261-65; R. 87: James Chapman, TR (Trial Day 5) at 2211-14.] Indeed, the Sixth Circuit has already affirmed on the substantially-gainful-employment issue. [R. 112: Order at 2496-97.] Harrell proves no ineffectiveness on either prong.

To the extent Harrell throws in a claim that the Court should have instructed the jury "that uncompensated volunteer work does not satisfy" the standard, [R. 150: Motion at 2686,] any such argument would fail. The Court would have "correctly denied" such an instruction request because, as explained, it was "an inaccurate statement of the law." *United States v. Volkman*, 797 F.3d 377, 386 (6th Cir. 2015). The key, as set out, was not whether Harrell's work was compensated; it was whether it showed he *was capable of* substantially gainful employment. Whether Harrell's VC work satisfied the substantially-gainful-employment standard was one of the central issues in dispute; Harrell may not value our jury-trial system, but the Court would not have effectively taken the issue out of the jury's hands via a legally incorrect instruction. [*See, e.g.*, R. 54: Order at 211 (denying Rule 29 motion); R. 88: Court, TR (Sentencing) at 2340.]

Harrell also makes a cumulative error argument. [R. 150: Motion at 2686-87.] But because he does not establish any individual error, there are no errors to cumulate, "and the cumulative error doctrine does not warrant reversal." *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012).

Finally, Harrell wants an evidentiary hearing. [R. 150: Motion at 2687.] But because, as explained, "the motion and the files and records of the case conclusively show that [Harrell] is entitled to no relief," he is not entitled to one. 28 U.S.C. § 2255(b); *see Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018) (describing standard).

The Court should deny Harrell's § 2255 motion.

Respectfully submitted,

JASON D. PARMAN
FIRST ASSISTANT
UNITED STATES ATTORNEY

By: s/ James T. Chapman
James T. Chapman
Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507-1612
(859) 685-4804
James.Chapman2@usdoj.gov

## CERTIFICATE OF SERVICE

On August 18, 2026, I electronically filed this response through the ECF system, and I mailed this response to:

Jeremy Wayne Harrell
1608 Overlook Circle
Shelbyville, KY 40065
*Pro Se Defendant*

s/ James T. Chapman
Assistant United States Attorney